**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| BDR PHARMACEUTICALS INTERNATIONAL PVT. LTD.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES FOOD AND DRUG ADMINISTRATION;<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES;<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services;<br><br>KYLE A. DIAMANTAS, J.D., in his official capacity as Acting Commissioner of Food and Drugs,<br><br>Defendants. | Civil Action No. 1:26-cv-03679 |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**PAGE**


BACKGROUND .......... 3

A. The Statutory and Regulatory Framework .......... 3

1. The NCE Submission Bar and Its GAIN Extension .......... 3

2. Receipt, the Paragraph IV Acknowledgment Letter, and the Statutory Sequence . 4

3. Section viii Carve-Outs .......... 5

B. Factual Background .......... 6

1. Voquezna®, the QIDP Designations, and FDA's June 2025 Citizen-Petition Decision .......... 6

2. BDR's ANDA and Its Carve-Out .......... 8

3. FDA's Rejection of ANDA No. 221413 .......... 9

4. BDR's Pre-Suit Efforts and FDA Delay .......... 9

LEGAL STANDARD .......... 10

A. Preliminary Injunction Factors .......... 10

B. Irreparable Harm in This Circuit .......... 11

C. Equities and the Public Interest Merge .......... 11

D. Relief Compelling Discrete Agency Action .......... 12

E. De Novo Review Under the APA .......... 12

ARGUMENT .......... 13

A. BDR Is Likely to Succeed on the Merits of Its APA Claims .......... 13

1. FDA's Citizen-Petition Exclusivity Ruling Is Contrary to Law and in Excess of the Statutory Limitations in § 355f(c) .......... 13

a. Section 355f(c)(3) Limits the Extension by Approved Use, and Voquezna Is Not a QIDP .......... 13

b. The Purpose and Legislative History Confirm That GAIN Rewards Antibacterial and Antifungal Innovation, Not Acid Suppressants .......... 15

c. The Umbrella Policy Exceeds FDA's Statutory Authority and Is Owed No Deference .......... 16

d. In the Alternative, BDR's Carve-Out Places Its Application Outside the Extension .......... 19

2. FDA's Refusal to Receive ANDA No. 221413 Is Arbitrary and Capricious .......... 21

3. The Two Challenged FDA Actions Are Separate, Final Agency Actions .......... 22

a. FDA's Citizen-Petition Ruling Is Final Agency Action on the Exclusivity Issue ..... 22

b. FDA's Rejection of ANDA No. 221413 Is a Separate Final Agency Action 23

c. Both Claims Are Ripe, and BDR Has Standing ..... 23

4. FDA Has a Discrete Duty to Receive the ANDA Once the Unlawful Bar Is Removed ..... 25

B. BDR Will Suffer Irreparable Harm Absent a Preliminary Injunction ..... 25

1. Litigation-Timing Harm: FDA Is Erasing a Fixed Patent-Adjudication Window 25

2. First-Mover Harm: BDR Will Lose the Head Start Congress Conferred ..... 28

3. None of These Harms Can Be Remedied by Money Damages ..... 29

C. The Balance of Equities and the Public Interest Weigh in BDR's Favor ..... 29

1. FDA and Phathom Will Suffer No Cognizable Harm ..... 29

2. The Court Has Ample Equitable Discretion to Tailor Relief ..... 30

3. The Public Interest Strongly Favors Relief ..... 31

D. The Requested Order Enforces FDA's Discrete Statutory Duty and Preserves the Court's Ability to Grant Effective Merits Relief ..... 32

E. The Scope of Relief Is Narrow and No Security Is Required ..... 32

CONCLUSION ..... 33

## TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Abdullah v. Obama*,
753 F.3d 193 (D.C. Cir. 2014) .......... 11

*Bristol-Myers Squibb Co. v. Shalala*,
91 F.3d 1493 (D.C. Cir. 1996) .......... 6, 20

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
566 U.S. 399 (2012) .......... 5, 19

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......... 11

*Darby v. Cisneros*,
509 U.S. 137 (1993) .......... 24

*Davis v. Pension Benefit Guaranty Corp.*,
571 F.3d 1288 (D.C. Cir. 2009) .......... 10

*Dorfmann v. Boozer*,
414 F.2d 1168 (D.C. Cir. 1969) .......... 12

*Duncan v. Walker*,
533 U.S. 167 (2001) .......... 14

*Eagle Pharms., Inc. v. Azar*,
952 F.3d 323 (D.C. Cir. 2020) .......... 16

*Ferring Pharms. Inc. v. Burwell*, No. 15-cv-0802,
2016 WL 4734333 (D.D.C. Sept. 9, 2016) .......... 18

*Hecht Co. v. Bowles*,
321 U.S. 321 (1944) .......... 30

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,
608 U.S. 580 (2026) .......... 5

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......... 31

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 12, 17, 18

*Luokung Tech. Corp. v. Dep't of Def.*,
538 F. Supp. 3d 174 (D.D.C. 2021) .......... 11, 29

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 12, 21

*Mova Pharm. Corp. v. Shalala*,
140 F.3d 1060 (D.C. Cir. 1998) .......... 28

*Mova Pharm. Corp. v. Shalala*,
955 F. Supp. 128 (D.D.C. 1997) ........ 28

*Nat'l Pharm. All. v. Henney*,
47 F. Supp. 2d 37 (D.D.C. 1999) ........ 18

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 12, 29

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........ 25

*Sandoz Inc. v. Becerra*,
57 F.4th 272 (D.C. Cir. 2023) ........ 24

*Sandoz Inc. v. Cochran*,
No. 21-cv-00600 (D.D.C.) ........ 21, 29

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ........ 10

*Sigma-Tau Pharms., Inc. v. Schwetz*,
288 F.3d 141 (4th Cir. 2002) ........ 20

*St. Lawrence Seaway Pilots Ass'n, Inc. v. United States Coast Guard*,
85 F. Supp. 3d 197 (D.D.C. 2015) ........ 21

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........ 10

*Wis. Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985) ........ 11

*Wisconsin Gas Co. v. FERC*,
758 F.2d 669 (D.C. Cir. 1985). ........ 28

**Statutes**

21 C.F.R. § 314.101(e)(2) ........ 5, 21

21 C.F.R. § 314.94(a)(8)(iv) ........ 5, 19

21 U.S.C. § 355(c)(3)(E)(ii) ........ 4

21 U.S.C. § 355(j)(2)(A)(viii) ........ 2, 5, 19

21 U.S.C. § 355(j)(5)(B)(iii) ........ 2, 5, 26, 30

21 U.S.C. § 355(j)(5)(B)(iv) ........ 28

21 U.S.C. § 355(j)(5)(F)(ii) ........ 2, 4, 12, 22, 33

21 U.S.C. § 355f ........ 1, 2, 12

21 U.S.C. § 355f(a) ........ 4, 7, 18, 22, 33

21 U.S.C. § 355f(c) ........ 14, 18

21 U.S.C. § 355f(c)(2) ........ 3, 4, 9, 16, 17, 18, 21

21 U.S.C. § 355f(c)(3) ........ 3, 4, 9, 13, 14, 15, 21
21 U.S.C. § 355f(d)(1) ........ 19
21 U.S.C. § 355f(g) ........ 4, 7, 13
5 U.S.C. § 702 ........ 11, 24, 29
5 U.S.C. § 704 ........ 24
5 U.S.C. § 705 ........ 30
5 U.S.C. § 706 ........ 12
5 U.S.C. § 706(1) ........ 12, 25
5 U.S.C. § 706(2) ........ 25
5 U.S.C. § 706(2)(A) ........ 12, 17, 22
5 U.S.C. § 706(2)(C) ........ 12, 17

**Other Authorities**

*Guidance for Industry: Qualified Infectious Disease Product Designation — Questions and Answers* 3 (May 2021) ........ 14
*Qualified Infectious Disease Product Designation — Questions and Answers* 3 (May 2021) .... 19

**Rules**

Fed. R. Civ. P. 65(a)(2) ........ 12, 31, 33
Fed. R. Civ. P. 65(c) ........ 33
Fed. R. Civ. P. 65(d)(1) ........ 32
LCvR 65.1.1 ........ 33

**Regulations**

21 C.F.R. § 10.25(a) ........ 22
21 C.F.R. § 10.30(e) ........ 22
21 C.F.R. § 10.30(k) ........ 22
21 C.F.R. § 10.45(d) ........ 22
21 C.F.R. § 314.101(b) ........ 4, 25, 32
21 C.F.R. § 314.101(d) ........ 25
21 C.F.R. § 314.101(e) ........ 25
21 C.F.R. § 314.95(b)(1)–(2) ........ 5
21 C.F.R. § 314.95(b)(2) ........ 26
21 C.F.R. § 314.95(c) ........ 5

Plaintiff BDR Pharmaceuticals International Pvt. Ltd. ("BDR" or "Plaintiff") asks this Court to prevent irreparable harm caused by the wrongful conduct of Defendant United States Food and Drug Administration ("FDA"). The FDA rejected receipt of BDR's abbreviated new drug application ("ANDA") No. 221413 for generic vonoprazan tablets — an acid suppressant — on the improper grant of a regulatory exclusivity that Congress reserved for antibacterial and antifungal drugs.

The Generating Antibiotic Incentives Now Act, 21 U.S.C. § 355f (the "GAIN Act"), adds five years to the new chemical entity ("NCE") exclusivity period that bars generic submissions, but only for qualified infectious disease products ("QIDPs"). FDA had applied GAIN exclusivity to two previously approved vonoprazan products for Phathom Pharmaceuticals, Inc. ("Phathom") that combined vonoprazan with antibiotics and therefore were designated as QIDP — Voquezna® Triple Pak (NDA No. 215152), which pairs vonoprazan with old, known antibiotics amoxicillin and clarithromycin, and Voquezna® Dual Pak (NDA No. 215153), which pairs vonoprazan with amoxicillin.

When FDA later approved Phathom's single-ingredient Voquezna® (vonoprazan fumarate) Tablets, NDA No. 215151, it invoked its non-statutory "umbrella policy" in response to a Phathom citizen petition and extended GAIN exclusivity to that product as well — through May 3, 2032 (the "NCE*GAIN Date") — even though the tablets contain no antibiotic ingredient and were never designated a QIDP. Ex. 1, FDA Gain Decision. Relying on that citizen-petition ruling, FDA then rejected BDR's ANDA and declared that no ANDA referencing NDA No. 215151 may be submitted before May 3, 2032. Ex. 2, FDA Rejection Letter. FDA's product-wide application of the GAIN extension is contrary to the text, structure, and purpose of the GAIN Act and the

Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 355(j)(2)(A)(viii), 355(j)(5)(F)(ii), and 355f, and is arbitrary, capricious, and in excess of statutory authority.

In practical effect, FDA has converted a five-year incentive that Congress reserved for drugs that fight serious bacterial and fungal infections into a decade-long barrier to generic competition for a heartburn medicine. Voquezna® tablets contain a single active ingredient, vonoprazan, a potassium-competitive acid blocker that is not an antibacterial or antifungal drug and has no direct activity against bacteria or fungi. FDA itself acknowledged that "it is possible that Congress did not intend for drug products such as Voquezna® to benefit from NCE*GAIN exclusivity." Ex. 1, FDA Gain Decision at 9, FDA Gain Decision. FDA extended the five-year exclusivity bonus anyway.

The harm is not mere delay; it is the foreclosure of an entire statutory process, and it irreparably harms BDR's ability to obtain ANDA approval before the patent expires. BDR lawfully carved out of its proposed labeling every antibiotic and antifungal indication and seeks approval only for acid-related uses, yet FDA refused to receive the application. Unless and until FDA receives the ANDA, BDR cannot take any of the statutorily prescribed steps for initiating patent litigation and resolving the patent issues before the patent expires.

Timing is, therefore, at the heart of this motion. U.S. Patent No. 9,186,411 ("the '411 patent") — the patent to which BDR has made a paragraph IV certification in its ANDA — expires on August 11, 2030. Ex. 3, May 2026 ANDA Letter; Ex. 4, Orange Book Patents. Congress created a thirty-month stay to give district courts time to resolve pharmaceutical patent infringement litigation before a generic product reaches the market. 21 U.S.C. § 355(j)(5)(B)(iii). That process unfolds in a fixed statutory sequence that begins with FDA's receipt of the ANDA and its issuance of a paragraph IV acknowledgment letter. None of the later steps — service of the paragraph IV

notice, the forty-five-day period in which the patent owner may sue, and the thirty-month stay — can begin until FDA formally "receives" the ANDA. Because the patent's expiry is fixed, every month that passes is subtracted irretrievably from the period available to adjudicate BDR's freedom to market its vonoprazan fumarate product. Had FDA determined that the ANDA was received on May 3, 2026, the forty-five-day period would have run in approximately June to July 2026, and a thirty-month stay would have ended in approximately December 2028 to January 2029 — leaving roughly nineteen to twenty months for a district court decision and appeal before the '411 patent expires.

To be clear, BDR does not ask this Court to order FDA to approve its ANDA. BDR asks only that FDA be required to stop recognizing an improperly awarded exclusivity and to receive an application the FDCA permits to be submitted. Each preliminary injunction factor favors that relief. BDR is likely to succeed because § 355f(c)(2) and (c)(3) each prevent the GAIN extension from attaching to Voquezna® tablets, FDA's umbrella policy commands no deference and is reviewed *de novo* after *Loper Bright*, and FDA's rejection ignored BDR's carve-out altogether. BDR's harm is irreparable because every month of delay permanently shortens a fixed patent-litigation window that closes on August 11, 2030. And the equities and the public interest favor an order that restores the generic competition Congress intended; the public should not be denied access to lower-cost vonoprazan because of a GAIN exclusivity improperly granted to an antacid.

## <u>BACKGROUND</u>

### A. The Statutory and Regulatory Framework

#### 1. The NCE Submission Bar and Its GAIN Extension

Where an NDA is approved for a drug containing no previously approved active moiety, "no application may be submitted" under § 355(j) referencing that NDA "before the expiration of five years from the date of the approval," except that such an application "may be submitted after

the expiration of four years" if it contains a paragraph IV certification. 21 U.S.C. § 355(j)(5)(F)(ii). The four-year exception is the "NCE-1" date.

The GAIN Act provides that "[i]f the Secretary approves an application pursuant to section 355 for a drug that has been designated as a qualified infectious disease product under subsection (d)," the four- and five-year NCE periods of §§ 355(c)(3)(E)(ii) and 355(j)(5)(F)(ii), among others, "shall be extended by 5 years." 21 U.S.C. § 355f(a). Congress then fenced that extension in. Subsection (a) "does not apply to the approval of," among other things, "a subsequent application filed with respect to a product approved under section 505 for a change that results in a new indication, route of administration, dosing schedule, dosage form, delivery system, delivery device, or strength," or "a product that does not meet the definition of a qualified infectious disease product under subsection (g) based upon its approved uses." *Id.* § 355f(c)(2)–(3). A QIDP, in turn, is "a drug . . . , including an antibacterial or antifungal drug, for human use that" both "acts on bacteria or fungi or on substances produced by such bacteria or fungi" and "is intended to treat a serious or life-threatening infection." *Id.* § 355f(g). QIDP designation must be requested by the sponsor. *Id.* § 355f(d)(1); Ex. 3, May 2026 ANDA Letter. Notably, Phathom did not request a QIDP designation for its single ingredient Voquezna® product.

**2. Receipt, the Paragraph IV Acknowledgment Letter, and the Statutory Sequence**

FDA will "determine whether the ANDA may be received" under 21 C.F.R. § 314.101(b). "Receipt" is "a threshold determination that the abbreviated application is substantially complete"; if the application was substantially complete upon submission, FDA "will consider the ANDA to have been received as of the date of submission." *Id.* § 314.101(b)(1)-(2). If an ANDA contains a paragraph IV certification, FDA will issue a paragraph IV acknowledgment letter that is the statutory trigger that sets off a chain of events. *Id.* A paragraph IV notice "must be sent" to the

NDA holder and patent owner on or after the date of receipt of the paragraph IV acknowledgment letter and within twenty days after its postmark; a notice "sent prior to" receipt of the acknowledgment letter "is invalid." 21 C.F.R. § 314.95(b)(1)–(2). The notice itself must state that FDA has received the ANDA and that the applicant has received the acknowledgment letter. *Id.* § 314.95(c). If the NDA holder or patent owner sues within forty-five days of receiving the notice, approval of the ANDA is stayed for up to thirty months, or until an earlier court decision that the patent is invalid or not infringed, and the parties are directed to "reasonably cooperate in expediting the action." 21 U.S.C. § 355(j)(5)(B)(iii).

FDA has by regulation declared that it will consider an ANDA not to have been received where the submission "is not permitted" under the NCE or GAIN provisions, including §§ 505(j)(5)(F)(ii) and 505E(a). 21 C.F.R. § 314.101(e)(2). That regulation is the engine of the rejection here — and it operates only if FDA's reading of the underlying statutes is correct.

**3. Section viii Carve-Outs**

An ANDA applicant who does not seek approval for a patented or exclusivity-protected method of use may omit that use from its proposed labeling and file a "section viii" statement rather than a patent certification. 21 U.S.C. § 355(j)(2)(A)(viii); 21 C.F.R. § 314.94(a)(8)(iv). The Supreme Court has explained that the statute "contemplates that one patented use will not foreclose marketing a generic drug for other unpatented ones," and permits a generic applicant to "propose labeling . . . that 'carve[s] out' from the brand's label the still-patented methods of use." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 406-415 (2012). The Supreme Court recently reaffirmed that mechanism. *Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 608 U.S. 580, 585-86 (2026) (confirming that a generic applicant may seek approval for non-protected uses without reproducing every protected use on the reference product's label). The D.C. Circuit has likewise held that FDA may approve an ANDA that omits an indication or other aspect of labeling

that is protected by exclusivity. *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1499–1500 (D.C. Cir. 1996).

## B. Factual Background

### 1. Voquezna®, the QIDP Designations, and FDA's June 2025 Citizen-Petition Decision

Vonoprazan was first approved on May 3, 2022, when FDA approved two co-packaged combination products containing vonoprazan and known antibiotics for treating *H. pylori* infection. The first co-packaged product, Voquezna® Triple Pak (NDA No. 215152), contains vonoprazan fumarate tablets, amoxicillin capsules, and clarithromycin tablets. The second, Voquezna® Dual Pak (NDA No. 215153), contains vonoprazan tablets and amoxicillin capsules. Both clarithromycin and amoxicillin were well-known antibiotics for *H. pylori* treatment in 2022, when vonoprazan was approved. Declaration of Dr. David Metz, M.D. ("Metz Decl.") at ¶ 20-21.

FDA subsequently approved Voquezna® with the single-ingredient vonoprazan tablets on November 1, 2023, for healing and maintenance of healing of erosive esophagitis and relief of associated heartburn, and for treatment of *H. pylori* infection when used in combination with amoxicillin and clarithromycin or with amoxicillin alone; on July 17, 2024, FDA added relief of heartburn associated with non-erosive gastroesophageal reflux disease. Ex. 1, FDA Gain Decision; Ex. 5, Citizen Petition. Voquezna® is listed in FDA's official public register of approved drug products, *Approved Drug Products with Therapeutic Equivalence Evaluations* (the "Orange Book"), as being covered by two patents: U.S. Patent No. 7,977,488 (the "'488 patent"), expiring April 10, 2030, and the '411 patent, expiring August 11, 2030. Ex. 2, FDA Rejection Letter; Ex. 6, Orange Book Voquenza.

Phathom never obtained a QIDP designation for Voquezna® tablets.[1] FDA designated as QIDPs only the two co-packaged Dual and Triple Paks, on May 5, 2021, and did so "in part because of their indication to treat *H. pylori*." Ex. 1, FDA Gain Decision; Ex. 5, Citizen Petition. Phathom "did not request QIDP designation for Voquezna," and Voquezna® "was not designated as a QIDP." *Id.* Phathom nonetheless subsequently obtained the GAIN extension for Voquezna® tablets by invoking FDA's "umbrella policy," as described below.

Because vonoprazan was a previously unapproved active moiety, FDA recognized five years of new chemical entity ("NCE") exclusivity running from the May 3, 2022 approval of the Paks, through May 3, 2027. *Id.*; Ex. 5, Citizen Petition. And because the Paks were QIDP-designated products containing an antibacterial drug and intended to treat a serious or life-threatening infection, 21 U.S.C. § 355f(g), FDA applied the GAIN provision of 21 U.S.C. § 355f(a) and extended that period by five years, to May 3, 2032. Ex. 2, FDA Rejection Letter.

Phathom then filed a Citizen Petition with FDA to add five more years under GAIN for the Voquezna® vonoprazan tablets alone, notwithstanding the absence of any QIDP designation for that product. Ex. 5, Citizen Petition. In response to Phathom's petition, and by response dated June 6, 2025, FDA granted the petition. Ex. 1, FDA Gain Decision. FDA found that under its "umbrella" policy — an interpretation announced in a 1989 proposed rule on the premise that the NCE provisions are "ambiguous" — NCE exclusivity attaches to the active moiety, so that the GAIN-extended period recognized for the Paks also covers Voquezna®. *Id.* FDA declared that the §

[1] The statute defines a "qualified infectious disease product" ("QIDP") as "a drug (including a biological product), including an antibacterial or antifungal drug, for human use that—(1) acts on bacteria or fungi or on substances produced by such bacteria or fungi; and (2) is intended to treat a serious or life-threatening infection, including such an infection caused by—(A) an antibacterial or antifungal resistant pathogen, including novel or emerging infectious pathogens; or (B) qualifying pathogens listed by the Secretary under subsection (f)." 21 U.S.C. § 355f(g).

355f(c) limitations, including the absence of a QIDP designation, did not change that result. *Id.* In making that finding, FDA conceded that the legislative record contains no deliberation on the interaction between GAIN and the umbrella policy, and that "it is possible that Congress did not intend for drug products such as Voquezna to benefit from NCE*GAIN exclusivity." *Id.* (emphasis added). FDA thus resolved the scope of a provision enacted in 2012 and amended thereafter by applying an interpretive policy adopted in 1989, twenty-three years before the GAIN Act existed.

**2. BDR's ANDA and Its Carve-Out**

On the NCE-1 date, May 3, 2026, BDR — through its U.S. agent Apotex Corp. — submitted ANDA No. 221413 for vonoprazan fumarate tablets, 10 mg and 20 mg, referencing NDA No. 215151. Declaration of Arvind Badiger (Badiger Decl. at ¶ 4). Apotex had notified FDA of the forthcoming submission on May 1. Ex. 7 at 12, FDA Correspondence. The ANDA contained a paragraph III certification to the '488 patent and a paragraph IV certification to the '411 patent, as well as BDR's GAIN letter. Ex. 3, May 2026 ANDA Letter; Ex. 8, September 29 Letter to FDA.

BDR designed its application to stay outside the GAIN extension altogether. Its proposed labeling carves out every *H. pylori* and antibacterial-regimen indication and retains only acid-related uses: relief of heartburn associated with gastroesophageal reflux disease and healing and maintenance of healing of erosive esophagitis. Ex. 8, September 29 Letter to FDA; Ex. 9, Proposed Label. In other words, BDR's product will not be indicated for the treatment of any infection or for use in combination with any antibiotic. Ex. 8, September 29 Letter to FDA. With its ANDA, BDR submitted a letter explaining that the GAIN extension cannot lawfully bar an application for vonoprazan's non-QIDP uses, and requesting that FDA conditionally accept the ANDA pending resolution of that question. Ex. 3, May 2026 ANDA Letter; Badiger Decl. at ¶7)

**3. FDA's Rejection of ANDA No. 221413**

FDA refused even to accept the ANDA for substantive review. In a notice, FDA stated that the submission was "technically deficient" and was "being rejected"; that NDA 215151 "is protected by 5 years of NCE exclusivity with an additional 5 years for the [GAIN] exclusivity, the expiry of which is May 3, 2032"; that "the earliest an ANDA citing NDA 215151 as its basis of submission may be submitted is May 3, 2032"; and that "[y]our application was submitted prior to the expiration of the NCE and GAIN exclusivity. Therefore, your submission is invalid and hereby rejected." Ex. 2, FDA Rejection Letter.

FDA acknowledged BDR's GAIN letter but declined to address it for not being the proper venue. *Id.* FDA also denied BDR's request for conditional acceptance. *Id.* FDA offered no analysis of 21 U.S.C. § 355f(c)(2) or (c)(3), no analysis of BDR's carve-out, and no explanation of why a product without QIDP designation falls within a QIDP-based exclusivity extension.

**4. BDR's Pre-Suit Efforts and FDA Delay**

FDA's ultimate rejection of the ANDA did not come in a timely fashion. FDA told BDR, repeatedly, that the matter remained open. On July 7 and August 4, 2026, FDA wrote that it was "actively reviewing the correspondence" and asked BDR to check back in three and four weeks. Badiger Decl. at ¶ 8; Ex. 7, FDA Correspondence. On July 30, FDA stated that it "is working to complete the filing determination and hopes to have that wrapped up soon." *Id.* On September 3 — more than 120 days after submission — FDA again said it was "actively reviewing" and declined a teleconference as "unwarranted"; on September 10, FDA stated that it "is unable to identify when a decision will be made." *Id.* BDR learned of the rejection only on September 18, 2026, when FDA's user-fee staff advised that the ANDA "was recently rejected by the Agency for exclusivity reasons" and was "not deemed submitted." *Id.* FDA transmitted the formal rejection notice on September 21, 2026. Ex. 2, FDA Rejection Letter; Ex. 7, FDA Correspondence; Ex. 8,

September 29 Letter to FDA; *see also* Badiger Decl. at ¶ 8. BDR treats September 21, 2026 as the date of the final agency action under review.

On September 28, 2026, counsel for BDR asked FDA either to waive any citizen-petition requirement or to commit not to assert ripeness or exhaustion defenses. BDR followed up the same day with a written request in a letter. Ex. 8, September 29 Letter to FDA. That letter explained that a second citizen petition would be futile because FDA had already decided the GAIN question in the Phathom docket, and it requested a response by October 9, 2026. *Id*. FDA responded on October 9, 2026 maintaining its prior positions and reserving all rights. Ex. 10, October 9 Letter to AFS. On October 14, counsel for BDR informed FDA that it is planning to file an action in district court with a motion for preliminary injunction and requested a call to see if any agreement can be reached on procedural issues. Ex. 7, FDA Correspondence. FDA offered a "listening call," which took place on October 20, 2026. *Id.* In advance of that call, BDR provided FDA courtesy copies of the complaint and preliminary injunction materials. *Id.*

## LEGAL STANDARD

### A. Preliminary Injunction Factors

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). BDR satisfies each of the four factors independently. To the extent the sliding-scale approach described in *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288, 1291–92 (D.C. Cir. 2009), survives *Winter* — a question the D.C. Circuit has reserved, *see Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) — it would only reinforce the case for relief, because BDR's showing on irreparable harm is unusually strong and the merits

present a pure question of statutory interpretation. BDR does not rely on that framework, and the Court need not resolve its continued viability to grant this motion.

Ultimately, the question is whether the movant has shown that all four factors, taken together, weigh in favor of preliminary injunctive relief. *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014). As described below, BDR makes a strong showing on each of the four factors to establish that it is entitled to a preliminary injunction.

**B. Irreparable Harm in This Circuit**

Irreparable injury in this Circuit must be "both certain and great," "actual and not theoretical," and "of such imminence that there is a 'clear and present' need for equitable relief." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). A failure to demonstrate irreparable harm is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Economic loss ordinarily is not irreparable because a later damages award can redress it. That rationale has no application where the loss cannot be recovered as a matter of law, as it cannot be here: the APA waives sovereign immunity only for relief "other than money damages," 5 U.S.C. § 702, and no other waiver permits a damages recovery against FDA on these claims. *See Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 192 (D.D.C. 2021) ("when a plaintiff's alleged damages are unrecoverable, such as here, due to the sovereign immunity enjoyed by Defendants, courts have recognized that unrecoverable economic loss can indeed constitute irreparable harm"). In any event, BDR's principal injury is not economic. It is the loss of a statutory adjudicatory process measured against a patent expiry that no judgment can postpone.

**C. Equities and the Public Interest Merge**

Where the Government is the opposing party, the third and fourth factors — the balance of

equities and the public interest — "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

**D. Relief Compelling Discrete Agency Action**

The requested order enforces a specific statutory and regulatory duty: receipt of an ANDA once FDA's sole stated legal bar is removed. BDR recognizes that this Circuit counsels caution before granting mandatory interim relief, particularly relief that would give the movant the ultimate relief it seeks. *See Dorfmann v. Boozer*, 414 F.2d 1168, 1173 n.13 (D.C. Cir. 1969). That concern carries little weight here. The order would not command approval, a scientific judgment, or market entry; it would restore the threshold step FDA would have taken but for its legal error, and FDA would remain free to apply every other receipt criterion. And because the merits present a pure question of law on a compact record, the Court can eliminate any concern about provisional mandatory relief by consolidating the hearing with the merits under Fed. R. Civ. P. 65(a)(2). *See infra* Argument Part E.

**E. De Novo Review Under the APA**

This case present a question of statutory interpretation. Under 5 U.S.C. § 706, the reviewing court "shall decide all relevant questions of law" and shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C); and shall "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1). Following *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), the Court owes no deference to FDA's construction of §§ 355(j)(5)(F)(ii) and 355f and must independently determine the best reading of those provisions. Where an agency does act within a zone of discretion, it must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Because the legality of FDA's

action is a question of law, BDR's likelihood of success turns on whether FDA's reading of those provisions is the best reading — not on any predictive judgment about contested facts.

## ARGUMENT

### A. BDR Is Likely to Succeed on the Merits of Its APA Claims

BDR challenges two separate agency actions: FDA's award of GAIN exclusivity to a vonoprazan product that is not an antibiotic nor has antibacterial properties, and FDA's rejection of a vonoprazan ANDA that seeks approval for no antibacterial indication. Each is final agency action ripe for this Court's review, *see infra* Argument Part A.3, and BDR is likely to succeed in showing that each is contrary to law.

#### 1. FDA's Citizen-Petition Exclusivity Ruling Is Contrary to Law and in Excess of the Statutory Limitations in § 355f(c)

##### a. Section 355f(c)(3) Limits the Extension by Approved Use, and Voquezna Is Not a QIDP

In its ruling on Phathom's citizen petition, FDA extended NCE*GAIN exclusivity to NDA No. 215151 product-wide, without regard to whether all approved uses of Voquezna® tablets are for a QIDP use. That ruling cannot be squared with the statute. Congress did not grant an unconditional five-year bonus to every molecule that once appeared in a QIDP. Subsection (c) places limitations on the grant of GAIN exclusivity.

It provided that the extension "does not apply to the approval of . . . a product that does not meet the definition of a qualified infectious disease product under subsection (g) based upon its approved uses." 21 U.S.C. § 355f(c)(3). The statutory touchstone is therefore *use*, not molecule. A QIDP must "act[] on bacteria or fungi or on substances produced by such bacteria or fungi" and be "intended to treat a serious or life-threatening infection." *Id.* § 355f(g). Voquezna® tablets satisfy neither condition: vonoprazan is a potassium-competitive acid blocker that suppresses gastric acid, and no approved use of the tablets is the treatment of an infection standing alone. Ex.

1, FDA Gain Decision; Ex. 3, May 2026 ANDA Letter. FDA designated only the co-packaged Paks — which contain the antibiotics amoxicillin and clarithromycin — and did so "in part because of their indication to treat *H. pylori*." Ex. 1, FDA Gain Decision. The single ingredient Voquezna® tablets were never designated as a QIDP, and BDR's ANDA references Voquezna® (NDA No. 215151), not the Paks (NDA Nos. 215152 and 215153). *Id.*; Ex. 2, FDA Rejection Letter;Metz Decl. at ¶22.

FDA's answer — that the § 355f(c) limitations "have no bearing" once an extension has been recognized for some product, Ex. 1, FDA Gain Decision — reads subsection (c)(3) out of the statute for every product that matters. On FDA's view, a sponsor need only obtain one QIDP approval for a combination regimen; every later product containing the same active moiety then inherits a new extension, whatever its approved uses. That interpretation nullifies the very limitation Congress wrote to keep the GAIN bonus away from non-QIDP products. Courts do not read statutes so as to render express limitations inoperative. *See Duncan v. Walker*, 533 U.S. 167, 174-75 (2001).

Phathom itself conceded the operative principle: "the exclusivity extension under the GAIN Act can only apply when a product is, itself, designated as a QIDP." Ex. 5, Citizen Petition. And FDA's own guidance "considers the QIDP designation as applying to a specific drug product." *Id.* The guidance continues to say "[t]he designation is granted only to the sponsor making the request, rather than applying to a drug substance in general or beyond the specified indications." *Id.* (quoting FDA, *Guidance for Industry: Qualified Infectious Disease Product Designation — Questions and Answers* Q2, p.3 (May 2021)). Voquezna® tablets are not a QIDP and applying GAIN to the single ingredient tablet extends the 10 year exclusivity "beyond the specified [H. Pylori] indications" and into the acid-related treatment conditions which are not

entitled to such exclusivity. Therefore, § 355f(c)(3) withholds the GAIN extension from NDA No. 215151.

**b. The Purpose and Legislative History Confirm That GAIN Rewards Antibacterial and Antifungal Innovation, Not Acid Suppressants**

Every indicator of congressional purpose points the same way. GAIN was enacted as Title VIII of the Food and Drug Administration Safety and Innovation Act, Pub. L. No. 112-144, § 801(a), 126 Stat. 993, 1077 (2012), to address the threat of antimicrobial resistance by incentivizing new antibacterial and antifungal drugs for serious or life-threatening infections. Ex. 1, FDA Gain Decision. Senator Blumenthal, a lead sponsor, described the purpose as "to incentivize the development of new antibiotics, to treat, stop, and conquer the superbugs." 158 Cong. Rec. S3396 (May 22, 2012); Ex. 1, FDA Gain Decision. Representative Waxman cautioned that Congress must "make sure that we are only providing exclusivity for the kinds of drugs that will truly benefit the public health." *Id.* (quoting Hearing Before the Subcomm. on Health of the H. Comm. on Energy & Commerce, 112th Cong. 118 (Mar. 8, 2012)). FDA's implementing rule states that GAIN "is intended to encourage development of new antibacterial and antifungal drugs for the treatment of serious or life-threatening infections." 79 Fed. Reg. 32,464, 32,464 (June 5, 2014); Ex. 3, May 2026 ANDA Letter.

Applying GAIN to Voquezna® tablets serves none of those ends. Vonoprazan was not developed as an antibacterial or antifungal drug; acid suppressants have been co-prescribed with amoxicillin and clarithromycin in *H. pylori* regimens for decades, and other potassium-competitive acid blockers were approved abroad as early as 2005. Ex. 2, FDA Rejection Letter; Metz Decl. ¶ 16, 20. The extra five years on Voquezna® tablets protect acid-related markets — heartburn and esophagitis — that GAIN was never meant to subsidize. FDA's reading also creates a ready template for evasion: pair a new non-antibacterial molecule with old antibiotics, obtain a QIDP

designation for the combination, and then collect ten years of exclusivity on the stand-alone product for every indication. Ex. 3, May 2026 ANDA Letter; Ex. 8, September 29 Letter to FDA. BDR has identified no prior instance in which FDA extended NCE*GAIN exclusivity to a stand-alone, non-antibacterial product derived from a QIDP combination. Ex. 3, May 2026 ANDA Letter; Ex. 8, September 29 Letter to FDA.

Section 355f(c)(2) illustrates how far FDA's reading departs from that design. Congress withheld the GAIN extension from "a subsequent application filed with respect to a product approved under section 355 of this title for a change that results in a *new indication*, route of administration, dosing schedule, dosage form, delivery system, delivery device, or *strength*." 21 U.S.C. § 355f(c)(2) (emphasis added). That limitation confirms that Congress did not intend the GAIN bonus to follow a molecule into later products with different, non-infectious uses. NDA No. 215151 is the kind of "subsequent application" Congress had in mind: Phathom filed the Voquezna NDA after the May 3, 2022 approval of the Paks, and secured approval for a single-ingredient tablet, including a new 10 mg strength, for indications — erosive esophagitis and non-erosive reflux disease — that have nothing to do with infection. Ex. 1, FDA Gain Decision; Ex. 3, May 2026 ANDA Letter; Ex. 5, Citizen Petition. Granting GAIN to Voquezna single tablets violates § 355f(c)(2) because Voquezna vonoprazan tablets alone result in new acid-related indications and a new strength, which are both excluded.

**c. The Umbrella Policy Exceeds FDA's Statutory Authority and Is Owed No Deference**

FDA's power to bar ANDA submissions exists only to the extent Congress conferred it. This Circuit treats exclusivity provisions as statutory commands that leave "no room for the FDA to place additional requirements" on exclusivity Congress granted. *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 331 (D.C. Cir. 2020). Phathom invoked that principle in its petition. Ex. 5, Citizen

Petition. It cuts both ways: FDA has no more authority to enlarge an exclusivity beyond what Congress granted than to shrink it. By enforcing a GAIN-extended submission bar against an ANDA for a non-QIDP product, FDA acted "in excess of statutory jurisdiction, authority, or limitations," and its ruling must be set aside under 5 U.S.C. § 706(2)(C) as well as § 706(2)(A).

FDA's umbrella theory lets Phathom obtain indirectly what § 355f(c)(2) forbids directly. FDA and Phathom respond that the extension was "earned" by the Paks, so the limitations are measured only at the Paks' approval. Ex. 1, FDA Gain Decision; Ex. 5, Citizen Petition. But that reasoning makes subsection (c)(2) meaningless: no later product would ever need to qualify on its own if the extension automatically flowed to it through the active moiety. Congress explicitly identified new indications, dosage forms, and strengths as changes that do not carry the GAIN extension. FDA may not erase that judgment through an interpretive "umbrella" policy adopted in 1989—twenty-three years before GAIN was enacted.

FDA adopted the umbrella policy in a 1989 proposed rule, and finalized it in 1994, because it viewed the NCE provisions as "ambiguous" and chose the "broader interpretation" of their scope. Ex. 1, FDA Gain Decision at 3-4 (quoting 54 Fed. Reg. 28,872, 28,897 (July 10, 1989)). The umbrella policy also answers the wrong question. It addresses which follow-on applications the five-year NCE bar covers. It says nothing about whether a separate, later-enacted, condition-laden QIDP extension follows the molecule into products that Congress expressly excluded. The umbrella policy predates GAIN by more than two decades and was not designed for that question. Ex. 2, FDA Rejection Letter; Ex. 8, September 29 Letter to FDA. After *Loper Bright*, an agency's choice among competing readings of an ambiguous statute receives no deference; the Court must determine the best reading for itself. 603 U.S. at 412-13.

FDA's own decision shows that applying the extension here was, at best, an unexplained policy choice rather than a statutory command. FDA acknowledged that "the available legislative record does not include any public debate or deliberation regarding the specific interaction between the GAIN provisions and the umbrella policy," and conceded that "it is possible that Congress did not intend for drug products such as Voquezna® to benefit from NCE*GAIN exclusivity." Ex. 1, FDA Gain Decision. FDA then resolved that doubt in favor of the broadest possible monopoly. Nor does it help FDA to say that § 355f(a) extends only the "duration" of the underlying exclusivity and leaves its "scope" untouched. *Id.* The question is not how far an extension reaches once properly attached; it is to which approvals the extension attaches at all. Section 355f(c) answers that question approval by approval and product by product. Under *Loper Bright*, the Court may not defer to FDA's choice; under the text of § 355f(c)(2) and (c)(3) and congressional intent, it must reject it.

The authorities FDA and Phathom invoke do not hold otherwise. In its Citizen Petition proceeding, Phathom relied on the Government's position that the six-month pediatric extension "retains the character of the preexisting exclusivity." Ex. 5, Citizen Petition (quoting Defs.' Mem. in Opp'n to Pls.' Appl. for Prelim. Inj. at 16, *Nat'l Pharm. All. v. Henney*, 47 F. Supp. 2d 37 (D.D.C. 1999)). But BDR does not dispute that a properly attached GAIN extension carries the character of NCE exclusivity. The correct question is whether the extension attaches to NDA No. 215151 at all, and on that question GAIN contains express product-by-product limitations that Phathom's pediatric analogy does not address. Ex. 1, FDA Gain Decision. FDA likewise invokes *Ferring Pharms. Inc. v. Burwell*, No. 15-cv-0802, 2016 WL 4734333 (D.D.C. Sept. 9, 2016), for the importance of the umbrella policy. *Id. Ferring* held that the order of approval should not determine NCE eligibility because the single-entity products there would have qualified had they

been approved first. Ex. 3, May 2026 ANDA Letter (citing *Ferring*, 2016 WL 4734333, at *10–11). Here the opposite is true: vonoprazan alone, approved first, could never have earned a GAIN extension, because it is not an antibacterial or antifungal drug. *Id. Ferring* therefore confirms that the umbrella policy cannot be used to give a product an exclusivity it could never have earned on its own.

The GAIN designation provisions point the same way. Congress made QIDP designation a sponsor-requested, application-specific status: the sponsor must request it "at any time before the submission of" the NDA, and FDA must decide the request within sixty days. 21 U.S.C. § 355f(d)(1); Ex. 1, FDA Gain Decision. Phathom never asked for it, and FDA's own guidance treats a designation as applying to "a specific drug product." Ex. 5, Citizen Petition (quoting FDA, *Qualified Infectious Disease Product Designation — Questions and Answers* at p. 3 (May 2021)). That structure would be pointless if a designation granted for one application automatically extended exclusivity to every later application sharing an active moiety.

**d. In the Alternative, BDR's Carve-Out Places Its Application Outside the Extension**

Even if the GAIN extension could attach to Voquezna vonoprazan tablets (NDA No. 215151) in some respect, it cannot bar BDR's carved-out application. BDR's proposed labeling omits every *H. pylori* and antibacterial-regimen indication. Ex. 9, Proposed Label. That is the mechanism Congress authorized in 21 U.S.C. § 355(j)(2)(A)(viii) and FDA codified in 21 C.F.R. § 314.94(a)(8)(iv), which permits ANDA labeling to omit an indication or other aspect of labeling protected by patent or accorded exclusivity under section 505(j)(5)(F) of the FDCA. The Supreme Court has explained that the statute "contemplates that one patented use will not foreclose marketing a generic drug for other unpatented ones." *Caraco*, 566 U.S. at 415. The D.C. Circuit has held that the FDCA "expresses the legislature's concern that the new generic be safe and

effective for each indication that will appear on its label; whether the label for the new generic lists every indication approved for the use of the pioneer is a matter of indifference." *Bristol-Myers Squibb*, 91 F.3d at 1500. The Fourth Circuit upheld approval of generics for an unprotected indication notwithstanding orphan-drug exclusivity for another. *Sigma-Tau Pharms., Inc. v. Schwetz*, 288 F.3d 141, 148 (4th Cir. 2002). And FDA itself has approved carve-outs of exclusivity-protected labeling, including for example in oxandrolone where FDA permitted the carve-out of geriatric use information to prevent being barred based on 3 year geriatric exclusivity despite arguments regarding safety from the sponsor. Steven K. Galson, Dir., Ctr. for Drug Evaluation & Rsch., FDA, to Edward John Allera & Theodore Sullivan, Buchanan Ingersoll P.C., Docket No. 2005P-0383 (Dec. 1, 2006) at 13, https://downloads.regulations.gov/FDA-2005-P-0368-0004/attachment_1.pdf. Ex. 11.

FDA and Phathom may argue that NCE exclusivity is a product-wide submission bar and that carve-out precedent involves only use-specific protections. That objection misses what is at stake. BDR does not seek to carve around the five-year NCE bar; it filed on the NCE-1 date that the bar expressly permits. The only obstacle is the additional five years, and those years exist solely because of QIDP designations granted for an infectious-disease use. Ex. 1, FDA Gain Decision. Where the sole basis for an extension is a use, omitting that use removes the basis for the extension. If exclusivity tied to a protected indication cannot block approval of a carved-out generic for unprotected uses, an extension tied to carved-out infectious-disease uses cannot block *submission* of an application for non-QIDP uses. BDR acknowledges that no reported decision has addressed a carve-out of a GAIN-extended submission bar. But that novelty does not help FDA. FDA cites no authority for its position, and the text it must overcome — "based upon its approved uses" — is plain.

**2. FDA's Refusal to Receive ANDA No. 221413 Is Arbitrary and Capricious**

BDR submitted an ANDA with a proposed carve-out and a letter explaining why the GAIN extension could not lawfully bar that carved-out application. Badiger Decl. at ¶ 7, Ex. 3, May 2026 ANDA Letter. FDA acknowledged the letter but rejected the ANDA without engaging the application-specific question it raised: whether an ANDA that omits every QIDP-designated use can be refused at the threshold under § 314.101(e)(2). Ex. 2, FDA Rejection Letter. That is arbitrary and capricious. An agency must consider the important aspects of the problem before it, respond to significant arguments, and articulate "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. FDA's rejection does none of those things. It treats the Phathom ruling as dispositive but never explains why BDR's carve-out does not matter, why § 355f(c)(2) and (c)(3) do not control, or why BDR must file a second petition on a question FDA already resolved in the Phathom docket. Ex. 2, FDA Rejection Letter.

FDA's silence was not an oversight. At the September 28, 2026 conference, FDA indicated that BDR's May 3 letter raised points the Phathom response did not address, but did not identify any substantive new arguments. Ex. 8, September 29 Letter to FDA. FDA thus rejected the application on a ground it had never examined, after holding BDR's letter for more than four months while assuring BDR that it was "actively reviewing" the correspondence. Ex. 7, FDA Correspondence. FDA also denied conditional acceptance without explanation, although it has used conditional acceptance to preserve an applicant's position while an exclusivity question was resolved. Ex. 3, May 2026 ANDA Letter (citing Compl. for *Sandoz Inc. v. Cochran*, No. 21-cv-00600 (D.D.C.), Ex. 1-12). An agency that departs from its own prior practice must acknowledge and explain the departure. *See St. Lawrence Seaway Pilots Ass'n, Inc. v. United States Coast Guard*, 85 F. Supp. 3d 197, 207 (D.D.C. 2015).

The notice is also internally inconsistent. Even on FDA's own view of the law, the four-year paragraph IV submission date of § 355(j)(5)(F)(ii), extended by five years under § 355f(a), would permit submission on May 3, 2031 — yet the notice declares May 3, 2032 the earliest date on which any ANDA referencing NDA No. 215151 may be submitted. Ex. 2, FDA Rejection Letter; 21 U.S.C. §§ 355(j)(5)(F)(ii), 355f(a). A decision that labels a disputed question of statutory interpretation a "technically deficient" electronic submission, misstates the governing submission date, and declines to address the applicant's dispositive argument is the antithesis of reasoned decision making. The rejection must be set aside under § 706(2)(A) and (C) even if the Court declines to treat the citizen-petition ruling as separately reviewable.

### 3. The Two Challenged FDA Actions Are Separate, Final Agency Actions

#### a. FDA's Citizen-Petition Ruling Is Final Agency Action on the Exclusivity Issue

FDA's June 6, 2025 response to Phathom's Citizen Petition is a final agency action on the exclusivity issue. FDA's own regulations provide that the Commissioner's final decision on a petition submitted under 21 C.F.R. § 10.25(a) "constitutes final agency action." 21 C.F.R. § 10.45(d). FDA's regulations also treat action on routine correspondence differently from action on a citizen petition, and the citizen-petition regulation requires a written agency response granting, denying, or otherwise disposing of the petition. *See* 21 C.F.R. § 10.30(e), (k). FDA's final citizen-petition response granted Phathom's requested Orange Book correction and announced FDA's controlling legal position that NDA No. 215151 benefits from NCE*GAIN exclusivity through May 3, 2032. Ex. 1, FDA Gain Decision. That decision marked the consummation of FDA's decision-making process on exclusivity, determined the legal status of NDA No. 215151, and produced immediate legal consequences for all ANDA applicants seeking to reference that NDA. 21 C.F.R. § 10.25(a).

**b. FDA's Rejection of ANDA No. 221413 Is a Separate Final Agency Action**

Even apart from the citizen-petition ruling, FDA's rejection of ANDA No. 221413 is final agency action. Agency action is final when it (1) "mark[s] the 'consummation' of the agency's decisionmaking process" and is not "merely tentative or interlocutory," and (2) is "one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). FDA did not request information, identify a curable deficiency, or leave the application pending. Instead, it declared the submission "invalid and hereby rejected" and announced that "the earliest an ANDA citing NDA 215151 as its basis of submission may be submitted is May 3, 2032." Ex. 2, FDA Rejection Letter. FDA's user-fee staff confirmed the categorical nature of that action when it offered a refund on BDR's filing fee. Ex. 7, FDA Correspondence. The rejection meets both prongs of *Bennett*. It consummates FDA's decision-making on this specific application. It also imposes concrete legal consequences by preventing receipt, the paragraph IV acknowledgment letter, valid paragraph IV notice, the 45-day suit window, and the 30-month stay.

**c. Both Claims Are Ripe, and BDR Has Standing**

The exclusivity challenge is ripe because FDA has already decided the legal issue and applied that decision to BDR. The refusal-to-accept challenge is ripe because FDA has already rejected the application. BDR has suffered injury in fact: denial of receipt, loss of the paragraph IV acknowledgment mechanism, inability to serve valid notice, and compression of the patent-adjudication window. That injury was caused by FDA's actions, and an order vacating or enjoining those actions and compelling receipt would redress it.

Exhaustion bars neither route. The APA permits judicial review of final agency action, and an otherwise-final action remains final unless a statute expressly requires an administrative appeal

or an agency rule requires such an appeal and renders the action inoperative while that appeal is pending. *Darby v. Cisneros*, 509 U.S. 137, 154 (1993); *see also* 5 U.S.C. § 704. FDA's citizen-petition process does not render either the June 2025 exclusivity ruling or the ANDA rejection inoperative. Nor would a duplicative petition serve any purpose of issue exhaustion: FDA already considered the exclusivity issue in a public docket, after public comment, and applied that ruling to reject BDR's application. Ex. 1, FDA Gain Decision; *see Sandoz Inc. v. Becerra*, 57 F.4th 272, 279 (D.C. Cir. 2023). FDA's conduct confirms the point. FDA held BDR's GAIN letter for more than four months while "actively reviewing" it, then refused to engage, and at the September 28 conference declined to commit either way on exhaustion. Ex. 7, FDA Correspondence; Ex. 8, September 29 Letter to FDA. Requiring a second petition asking FDA to revisit a published decision it has already applied against BDR would be an empty formality.

BDR need not have been the petitioner in the Phathom proceeding to rely on FDA's final citizen-petition ruling. The APA authorizes review by a person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, and finality under *Bennett* turns on what the agency decided and what legal consequences flow from that decision, not on the identity of the original petitioner. *See Bennett*, 520 U.S. at 177–78. FDA's June 2025 ruling resolved the legal status of NDA No. 215151 for Orange Book and ANDA-submission purposes; BDR is the regulated applicant to whom FDA has now applied that ruling. In all events, the Court need not resolve that question to grant relief. FDA incorporated the June 2025 ruling into its rejection of ANDA No. 221413, and that rejection is indisputably final agency action directed at BDR. The Court may therefore review whether the exclusivity determination is legally correct, because it is the stated and sole basis for the action taken against BDR. That is true whether or not BDR could independently challenge the citizen-petition response.

#### 4. FDA Has a Discrete Duty to Receive the ANDA Once the Unlawful Bar Is Removed

Once FDA's unlawful exclusivity bar is removed, receipt is not an open-ended policy choice. Under 21 C.F.R. § 314.101(b), FDA evaluates a submitted ANDA to determine whether it may be received; if none of the grounds in § 314.101(d) or (e) applies, FDA receives the application and, for an ANDA containing a paragraph IV certification, issues a paragraph IV acknowledgment letter. FDA's only stated ground for refusing ANDA No. 221413 is the asserted NCE*GAIN submission bar. Ex. 2, FDA Rejection Letter. If that ground is unlawful, FDA is withholding the discrete agency action that its own regulation requires. The Court therefore may compel receipt under 5 U.S.C. § 706(1), or at minimum vacate the rejection and enjoin FDA from reapplying the same unlawful bar under § 706(2). *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64-65 (2004).

### B. BDR Will Suffer Irreparable Harm Absent a Preliminary Injunction

FDA's rejection inflicts three distinct injuries, each of which independently satisfies this Circuit's standard. First, it is consuming a fixed, non-extendable window for patent adjudication that closes when the '411 patent expires on August 11, 2030. Second, it is destroying the first-filer head start that Congress conferred on BDR as an NCE-1 paragraph IV applicant. Third, it is excluding BDR from a market Congress opened to it on May 3, 2026, and those losses are unrecoverable because the APA permits no damages remedy against FDA. No later judgment can undo any of these injuries, and no damages award can compensate them.

#### 1. Litigation-Timing Harm: FDA Is Erasing a Fixed Patent-Adjudication Window

FDA's decision to attach GAIN exclusivity to Voquezna has made a patent litigation case impossible to start. FDA states in its rejection notice that an ANDA application cannot be filed until 2032—well after expiry of the '411 patent in August 2030.

Even if this Court were to correct that error, it is important that correction happen before the end of this year and no later than early Spring of 2027. Because a rejected ANDA produces no paragraph IV acknowledgment letter, BDR cannot serve valid notice, and a notice served without one "is invalid." 21 C.F.R. § 314.95(b)(2). Without valid notice, no 45-day window opens under 21 U.S.C. § 355(j)(5)(B)(iii), no infringement or declaratory-judgment action is triggered, and no 30-month stay attaches. Each step is a statutory entitlement of a paragraph IV applicant, and each is unavailable to BDR for as long as the rejection stands. Ex. 2, FDA Rejection Letter.

Because the '411 patent expires on August 11, 2030, each month of delay compounds the harm. Hatch-Waxman litigation ordinarily requires approximately thirty months to a district court decision. 21 U.S.C. § 355(j)(5)(B)(iii) ; *see also Ben Venue Labs., Inc.*, 146 F.Supp.2d at 579 ("[T]he purpose of the 30-month stay is…to create an adequate window of time during which to litigate the question of whether a generic will infringe the patented product, without actually having to introduce the generic product to the market.'' (*citing* 130 Cong. Rec. H9118 (daily ed. Sept. 6, 1984) (statement of Rep. Waxman); 130 Cong. Rec. S10504 (daily ed. Aug. 10, 1984) (statement of Sen. Hatch))). If the Court orders receipt promptly and the 30-month stay is back-dated and measured from the date it would have run had FDA received the ANDA in the ordinary course, the stay would end in early 2029, leaving approximately nineteen to twenty months before the '411 patent expires. However, if the stay is not backdated, every month of delay in this Court extends the date when the 30-month stay would begin and expire.

Requiring BDR to file a second Citizen Petition on the same issue would irreparably harm BDR's ability to obtain a noninfringement or invalidity ruling on the patent before its expiry in August 2030. If BDR is required to file a Citizen Petition, it is very likely that the 30 month stay would end after expiry of the patent in August 2030, or, at best, approximately the same time as

the expiration date of the patent. Under 21 CFR Section 10.30(e)(2), the FDA is supposed to provide its response within 180 days of the petition filing date, but often takes much longer, sometimes years. Badiger Decl. at 9.




Thompson, B. M. (2023, October 3). *Unpacking averages: FDA's extraordinary delay in resolving citizen petitions*. Ebglaw. https://www.ebglaw.com/health-law-advisor/unpacking-averages-fdas-extraordinary-delay-in-resolving-citizen-petitions, last visited October 19, 2026. Ex. 34; *see also* Czaban, J. (2024, January 31). *Lessons learned: FDA digs up, and discards, time-capsule citizen petition re: Online drug and device promotion*. Loeb & Loeb LLP. Lexology. https://www.lexology.com/library/detail.aspx?g=33e073d5-8834-4292-a235-1fc49ad7af0e, last visited October 19, 2026. Ex. 35. In addition to being futile, if a Citizen Petition is required on the same issue, BDR would be unable to obtain a decision on the patent issue before the patent itself expires. (Badiger Decl. at ¶9 and 11) If a decision is sufficiently delayed in this court, it ensures the patent case becomes a nullity: the '411 patent will expire before any adjudication, and BDR's freedom to operate will never be decided.

This injury meets every element of the *Wisconsin Gas Co. v. F.E.R.C.* standard. The harm is "certain" because it follows automatically from the regulatory architecture rather than from any contingent business judgment: a rejected ANDA generates no acknowledgment letter, and without

an acknowledgment letter no valid notice can issue. It is "great" because it forfeits the adjudicatory window Congress built into the statute. It is "actual and not theoretical" because the rejection is in force and the acknowledgment letter is being withheld now. And it is "imminent" because every day of delay permanently subtracts from a fixed period measured against an August 11, 2030 expiry. *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

**2. First-Mover Harm: BDR Will Lose the Head Start Congress Conferred**

BDR filed on the first day the statute allowed, and that timing carries a statutory reward. Its paragraph IV certification to the '411 patent positions BDR as a first applicant eligible for 180-day exclusivity under 21 U.S.C. § 355(j)(5)(B)(iv). Badiger Decl. at ¶ 10. That position has value only if BDR's application is received and its certification is noticed and litigated before the patent expires. Every month of delay erodes the head start and increases the risk that later filers will crowd the field once the legal question is resolved. Badiger Decl. at ¶11.

This Court and the D.C. Circuit have already held that losing a statutory head start is irreparable. In *Mova Pharm. Corp. v. Shalala*, this Court granted a preliminary injunction against FDA in a Hatch-Waxman exclusivity dispute because the loss of a statutorily conferred head start could not be remedied later. 955 F. Supp. 128, 131-32 (D.D.C. 1997). The D.C. Circuit affirmed, agreeing that the loss of an "officially sanctioned head start" and its competitive consequences supported preliminary relief. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, n.6 (D.C. Cir. 1998). BDR's injury is of the same character and more acute: the plaintiff in *Mova* stood to lose exclusivity; BDR stands to lose the ability to invoke the patent-litigation process at all.

The head start also protects BDR's place in a market Congress opened to it. Absent the unlawful GAIN bar, BDR's ANDA would have been received on the NCE-1 date, May 3, 2026, and a lower-cost vonoprazan product would reach patients years before FDA's May 3, 2032 date. Badiger Decl. at ¶9 to 11. Market share, price position, and customer relationships lost to a delayed

or compressed launch cannot be reconstructed after the fact. Badiger Decl. at ¶ 11.

**3. None of These Harms Can Be Remedied by Money Damages**

Each of these injuries is permanent because no court can later award compensation for it. The APA waives sovereign immunity only for relief "other than money damages," 5 U.S.C. § 702, and no other waiver permits recovery against FDA for lost litigation time, a lost head start, or lost market position. Economic loss that cannot be recovered from the defendant is for that reason treated as irreparable. *See Luokung Tech. Corp.*, 538 F. Supp. 3d at 192 ("when a plaintiff's alleged damages are unrecoverable, such as here, due to the sovereign immunity enjoyed by Defendants, courts have recognized that unrecoverable economic loss can indeed constitute irreparable harm"). And the loss of litigation time is not economic at all: once the '411 patent expires, no remedy can restore the adjudication Congress designed the paragraph IV process to produce.

**C. The Balance of Equities and the Public Interest Weigh in BDR's Favor**

Because the Government is the opposing party, these factors merge. *Nken*, 556 U.S. at 435.

**1. FDA and Phathom Will Suffer No Cognizable Harm**

The order BDR seeks requires FDA to perform a threshold administrative act — receipt — and, if the application is otherwise substantially complete, to issue an acknowledgment letter. It does not require approval, does not require FDA to abandon any scientific review, and imposes no monetary cost. FDA receives ANDAs routinely, and it has used conditional acceptance to preserve an applicant's position while an exclusivity question is litigated. Ex. 3, May 2026 ANDA Letter (citing Compl. for *Sandoz Inc. v. Cochran*, No. 21-cv-00600 (D.D.C.), Ex. 1-12). An agency suffers no cognizable harm from being required to follow the law.

Phathom, although not a party to this action, has legitimate interests that are fully protected. Receipt is not approval. FDA cannot approve BDR's ANDA before May 3, 2027 in any event, and if Phathom or the patent owner sues within forty-five days of notice, a 30-month stay will bar

approval while the patent case proceeds. 21 U.S.C. § 355(j)(5)(B)(iii). BDR's carve-out leaves untouched every *H. pylori* indication for which a QIDP designation was granted, so the incentive Congress created for the Paks remains intact. Ex. 6, Orange Book Voquenza. What Phathom loses is only the ability to keep the patent case from starting — an interest the law does not protect. Phathom may move to intervene, and BDR does not oppose expedited consideration of any such motion.

Phathom's policy objection — that sponsors will abandon QIDP development if follow-on products do not inherit the GAIN extension, Ex. 5, Citizen Petition — collapses on these facts. The Voquezna Paks keep their full NCE*GAIN period through May 3, 2032 for the *H. pylori* regimens that earned it, and BDR seeks no approval for those regimens. Ex. 1, FDA Gain Decision; Ex. 9, Proposed Label. Voquezna® tablets also enjoyed the full umbrella of five-year NCE exclusivity from May 3, 2022 to May 3, 2027, which already barred any ANDA submission before the NCE-1 date. Ex. 1, FDA Gain Decision; Ex. 6, Orange Book Voquenza. The GAIN incentive Congress designed is thus fully honored. What Phathom asks to keep is a second, unearned five years for heartburn and esophagitis indications.

**2. The Court Has Ample Equitable Discretion to Tailor Relief**

The Court's equitable authority is broad and flexible. "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). The APA confirms that authority, empowering a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The Court therefore may fashion relief proportionate to the injury: it may enjoin FDA from applying the GAIN-extended bar to ANDA No. 221413; require FDA to conduct ordinary receipt review without that bar; direct, in the alternative, that

FDA conditionally receive the ANDA pending final judgment; and reserve for the merits BDR's request that receipt relate back to May 3, 2026 for timing purposes.

Tailored relief of this kind fits comfortably within this Circuit's preliminary-injunction precedent. The D.C. Circuit affirmed preliminary relief against FDA in *Mova* because the loss of an officially sanctioned head start could not later be restored, 140 F.3d at 1066, n.6, and it has recognized the substantial public interest in agencies abiding by the laws that govern them, *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Each alternative preserves the Court's ability to grant effective final relief; none requires FDA to approve anything; and each can be dissolved if FDA ultimately prevails. If the Court has any hesitation about interim mandatory relief, consolidation under Fed. R. Civ. P. 65(a)(2) removes it. *See infra* Argument Part E.

**3. The Public Interest Strongly Favors Relief**

"[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters of the U.S.*, 838 F.3d at 12. This Court applied the same principle in the FDA context in *Mylan*, observing that the public interest lies in agencies complying with their statutory mandates and that Hatch-Waxman reflects a congressional balance between incentives for innovation and timely generic entry. 81 F. Supp. 2d at 45. Relief here honors both halves of that balance. It leaves intact every exclusivity Congress actually granted, and it restores the patent adjudication Congress designed the paragraph IV mechanism to produce.

Relief also advances the core purpose of the Hatch-Waxman Amendments: "to make available more low cost generic drugs." H.R. Rep. No. 98-857, pt. 1, at 14 (1984); Ex. 5, Citizen Petition. Absent the unlawful bar, a lower-cost vonoprazan product would be available to the public much earlier. Generic entry for erosive esophagitis and reflux disease will increase

competition, lower prices, and expand access for patients whose conditions have nothing to do with antibiotic resistance. Badiger Decl. ¶ 12-13 The GAIN incentive, by contrast, is not diminished at all, because BDR seeks no approval for any infectious-disease use. Ex. 9, Proposed Label.

The public comments in the Phathom docket reinforce this conclusion. Each was filed in support of Phathom's petition, and each confirms that GAIN's public value lies in infectious-disease innovation.

### D. The Requested Order Enforces FDA's Discrete Statutory Duty and Preserves the Court's Ability to Grant Effective Merits Relief

The requested injunction enforces a discrete legal duty and gives BDR no windfall. BDR does not ask the Court to order approval, waive scientific review or other requirements. It asks only that FDA remove the unlawful NCE*GAIN obstacle and perform the threshold receipt function that § 314.101(b) prescribes, applying every other technical, scientific, and regulatory requirement as it ordinarily would. If the application is not otherwise substantially complete, FDA remains free to say so. The order thus restores the statutory position BDR should have occupied when it submitted its NCE-1 ANDA — a position that FDA's rejection, not BDR's motion, disturbed. And if the Court has any concern about affirmative relief before a final merits determination, consolidation under Rule 65(a)(2) converts the requested interim order into prompt final relief on a purely legal question, which BDR expressly requests.

### E. The Scope of Relief Is Narrow and No Security Is Required

The proposed order is drawn to comply with Fed. R. Civ. P. 65(d)(1): it states the reasons for issuance, states its terms specifically, and describes in reasonable detail the acts required. It is limited to ANDA No. 221413 and does not purport to adjudicate the lawfulness of FDA's umbrella exclusivity policy as applied to any other product or applicant.

As to security, Fed. R. Civ. P. 65(c) does not require a bond of the United States, its officers, or its agencies, and the United States will sustain no monetary loss from compliance. BDR requests that security be set at $0 or at a nominal amount. *See* LCvR 65.1.1.

**CONCLUSION**

For the foregoing reasons, BDR respectfully requests that the Court grant the Motion and enter the accompanying proposed order. The order should enjoin Defendants, during the pendency of this action, from applying the GAIN-extended submission bar of 21 U.S.C. §§ 355(j)(5)(F)(ii) and 355f(a) to ANDA No. 221413; direct FDA to accept and receive ANDA No. 221413 as of its original date of submission and, if the application is otherwise substantially complete, to issue the paragraph IV acknowledgment letter; and set security at $0 or a nominal amount. Because the merits present a pure question of law, BDR further requests that the Court direct Defendants to lodge the certified administrative record within seven days, set a hearing not later than twenty-one days after filing or decide the motion on the papers, and consolidate the hearing with a trial on the merits under Fed. R. Civ. P. 65(a)(2) or otherwise set an accelerated merits schedule. BDR requests such other and further relief as is just and proper.

Dated: October 21, 2026

ARENTFOX SCHIFF LLP

By: */s/ James H. Hulme*
James H. Hulme (D.C. Bar No. 323014)
Wayne Matelski (D.C. Bar No. 211607)
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006-5344
Ph: 202.857.6000
James.Hulme@afslaw.com
Wayne.Matelski@afslaw.com

Counsel for Plaintiff BDR Pharmaceuticals International Pvt. Ltd.

OF COUNSEL:
Sailesh K. Patel (motion for admission *pro hac vice* forthcoming)
Kevin Nelson (motion for admission *pro hac vice* forthcoming)
Gabriella Salek (motion for admission *pro hac vice* forthcoming)
ArentFox Schiff LLP
233 S. Wacker Drive
Chicago, IL 60606
sailesh.patel@afslaw.com
kevin.nelson@afslaw.com
gabriella.salek@afslaw.com